**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**

**CENTRAL DIVISION**

| | |
|---|---|
| **JUAN PABLO MATAS-VIDAL,** | |
| **Petitioner,** | **FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER** |
| v. | |
| **SUSAN CONSUELO LIBBEY-AGUILERA (aka Brooke Robinson),** | |
| **Respondent.** | **Case No. 2:13CV422 DAK** |

This matter is before the court on Juan Pablo Matas-Vidal's ("Petitioner" or "Mr. Matas-Vidal") Petition for Immediate Return of Children to Petitioner Pursuant to the Hague Convention and the International Child Abduction Remedies Act ("ICARA"). The court initially set a hearing on the Petition for June 18, 2013. At that hearing, however, Respondent Susan Consuelo Libbey-Aguilera, also known as Brooke Robinson ("Respondent" or "Ms. Libbey-Aguilera"), who is the mother of the children, requested that the court continue the hearing to allow her to obtain counsel and to respond to the Petition. The court then rescheduled the hearing for June 28, 2013, and the hearing took place on that date. At the hearing, Petitioner was represented by David S. Dolowitz and James M. Hunnicutt. Respondent was represented by Clayton A. Simms and Staci Visser.

Prior to June 28, 2013 hearing, the court carefully reviewed the Petition, the Response to the Petition (the "Response Brief"), and all affidavits and exhibits that had been provided to the court. At the June 28, 2013 hearing, Petitioner requested an opportunity to reply to Ms. Libbey-

Aguilera's Response, which had been filed the evening before the hearing. Petitioner's reply (the "Reply Brief") was filed on July 19, 2013.[1] The court has now carefully reviewed the Reply Brief, along with all exhibits accompanying the brief.[2] Now, having carefully considered all of the evidence submitted, along with the relevant authorities on the legal issues presented, the court renders the following Findings of Fact and Conclusions of Law and Order.

## I. BACKGROUND

### A. GENERAL FACTUAL BACKGROUND

Petitioner claims that his ex-wife wrongfully removed the parties' two minor children, SM-L and RM-L, from their habitual residence in Mexico City, Mexico, in December 2010 or January 2011. He contends that Respondent wilfully disobeyed the orders of the Mexican Court, which had given him custody rights and had prohibited Ms. Libbey-Aguilera from removing the couple's children from their habitual residence in Mexico. Petitioner further argues that Respondent's allegations of domestic violence are untrue and were fabricated long after the divorce proceedings to alienate the children from him. He contends that Respondent, after removing the children to the United States, hid the children from him by having her name changed through a court proceeding in the state of Idaho and by changing the names of their minor children in their school records. Petitioner asks this court to return the children to Mexico City so that the custody issues may be resolved there.

---

[1] The court initially set a deadline of July 12, 2013, but the parties stipulated to a one-week extension, until July 19, 2013, and the court permitted the extension.

[2] The court has also considered Respondent's Corrections to Respondent's Exhibits (Docket No. 33), Petitioner's Response to the Corrections (Docket No. 34), and a letter from the social worker who has recently met with the children. *See* Sealed Docket No. 35.

Respondent, however, contends that the Mexican court had awarded her sole custody and had dissolved the orders preventing her from leaving Mexico. Therefore, she argues, she did not wrongfully remove the children from Mexico. She also claims that she and the children were victims of domestic violence at the hands of Petitioner, which is why she fled Mexico. She has asserted several reasons why the children should not be sent back to Mexico.

**B.    LEGAL BACKGROUND**

This action has been brought pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention" or the "Convention"), which has been implemented in the United States by the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601-11610. The Hague Convention was adopted to protect children from the adverse effects of being wrongfully removed to or retained in a foreign country and to establish procedures for their return. *See Ohlander v. Larson*, 114 F.3d 1531, 1534 (10th Cir. 1997) (citing the Hague Convention on the Civil Aspects of International Child Abduction, Dec. 23, 1981, Preamble, 51 Fed. Reg. 10494, 10,498 (1986)). "The Convention is meant to provide for a child's prompt return once it has been established the child has been 'wrongfully removed' to or retained in any affiliated state." *Id*. (quoting Convention, art. 1). The court's role is not to make traditional custody decisions but to determine in what jurisdiction the children should be physically located so that the proper jurisdiction can make those custody decisions. *Loos v. Manuel*, 651 A.2d 1077 (N.J. Super. Ct. Ch. Div. 1994); *see also Friedrich v. Friedrich*, 78 F.3d 1060, 1063 (6th Cir. 1996).

## II.  HISTORY OF CASE

Petitioner filed the instant action on June 7, 2013.  At the same time, he filed a Motion for a Temporary Restraining Order, Order to Show Cause, Writ of Assistance, and Request for Immediate Return of Minor Children (the "Motion for a TRO").  On June 7, 2013, the court granted the Motion for a TRO and entered an Order (the "June 7, 2013 Order"), which, among other things, prohibited Ms. Libbey-Aguilera from interfering with the children being taken into protective custody. [3]  The June 7, 2013 Order also stated that the court would hold an immediate hearing after the Order was served to determine whether the court should order the return of the children to Petitioner to allow him to immediately return with them to Mexico.[4]

On June 14, 2013, the United States of America filed an Emergency Motion to Intervene, Request for Stay of Temporary Restraining Order and Hearing.[5]  The reason for United States' motion was that the United States believed there was a conflict between this court's June 7, 2013 Order and a previous Order entered by a Magistrate Judge of this court in a criminal Extradition proceeding involving Respondent.[6]  In the motion, the United States explained that the Government of Mexico had asked the United States, through diplomatic channels, for the provisional arrest of Ms. Libbey-Aguilera for the purpose of extradition for her alleged perpetration of Child Trafficking under Mexican law.  Pursuant to an arrest warrant signed by a

---

[3] *See* Docket No. 5

[4] *Id*.

[5] Docket No. 6.

[6] The Extradition proceeding is Case No. 2:13MJ151.  A probable cause hearing has been set for August 12, 2013.

4

Magistrate Judge on May 9, 2013, Ms. Libbey-Aguilera had been arrested, and an initial

appearance had been held on May 10, 2013.  The Magistrate Judge ordered, among other things,

that (1) Ms. Libbey-Aguilera wear a GPS ankle monitor, report to pretrial services daily, and

maintain her current residence; and (2) the two minor children were to remain with Ms. Libbey-

Aguilera at her residence;[7] and (3) the passports of Ms. Libbey-Aguilera and her children be

turned over to pretrial services; and that (4) Ms. Libbey-Aguilera and the minor children were not

to leave the state without the permission of the Court.[8]  Accordingly, the United States asked this

court for permission to intervene in the instant case and also to stay the proceedings, including

the court's Order dated June 7, 2013 until such time as the court could hold a hearing to address

the apparent conflict in the two Orders.  On June 17, 2013, the court set a hearing for June 18,

2013.

    The apparent conflict in the two court Orders had prevented the Orem Police Department

from contacting the Department of Child and Family Services ("DCSF").  Todd Gabler, a private

investigator in the State of Utah Department of Public Safety, who was working with Petitioner,

informed the court, through an affidavit filed on June 18, 2013, that, on June 13, 2013, he had

served a copy of this Court's June 7, 2013 Order on the Orem Police Department.[9]  At that time,

he had asked the officers to contact him when the Order was to be served on Ms. Libbey-

---

[7] The United States maintained that this court's June 7, 2013 Order directing the minor children to be taken into protective custody was in conflict with the Magistrate Judge's Order for the children to remain with Ms. Aguilera.

[8] *See* Case No. 2:13MJ151, Docket No. 6, Order Setting Conditions of Release at 2.

[9] *See* Docket No. 8.

Aguilera. He also served a copy of the Order on Ms. Libbey-Aguilera on June 16, 2013. He stated in his Affidavit that, moments after serving Ms. Libbey-Aguilera with the Order, the Orem Police Department responded to Ms. Libbey-Aguilera's residence, and he gave the officers another copy of the Order. According to Mr. Gabler, the officers refused to contact DCFS to pick up the children, as directed by the June 7 Order, because Ms. Libbey-Aguilera had produced the Magistrate Judge's Order, which she claimed required her to keep the children with her at her place of residence.[10]

During the June 18, 2013 hearing, the court permitted the United States to intervene for the purpose of pointing out the apparent conflict between this court's June 7 Order and the Magistrate Judge's Order Setting Conditions of Release in the Extradition proceeding. At the June 18, 2013 hearing, Ms. Libbey-Aguilera was not represented by counsel, but counsel who had been appointed pursuant to the Criminal Justice Act ("CJA") to represent her in her criminal Extradition proceeding, Clayton Simms, appeared as a friend of the court. He explained that Ms. Libbey-Aguilera had just been served with the actual Petition on that day and that she had not had an opportunity to find counsel to represent her. Mr. Simms requested that the court continue the hearing to allow Ms. Libbey-Aguilera time to find counsel. The court granted the request and continued the hearing until June 28, 2013.

On June 21, 2013, Mr. Simms requested that, due to the time-sensitive nature of this proceeding and his familiarity with the facts and circumstances of this case, he be appointed as Ms. Libbey-Aguilera's counsel in the instant matter because it is ancillary to his CJA

---

[10] *Id.*

appointment in the Extradition matter.[11]   The court granted the request.[12]

On June 24, 2013, Ms. Libbey-Aguilera filed a Motion to Appoint Guardian ad Litem ("GAL") for the two children involved in this matter.[13]  Mr. Matas-Vidal opposed the motion on June 25, 2013, and Ms. Libbey-Aguilera filed a Reply on June 26, 2013.[14]   The court issued an Order on June 26, 2013, deferring ruling on the motion until after the June 28, 2013 hearing.[15]  In the Order, the court explained that it intended to proceed with the scheduled June 28 hearing and that if it became apparent at the hearing that a GAL would be helpful to the court's determination, the court would appoint one and hold a subsequent hearing.[16]

At the June 28, 2013 hearing, the court heard argument from counsel on the merits of the Petition.[17]   At the hearing, the court also inquired about permitting Petitioner to see his children.[18] After some discussion among the parties, they agreed to arrange a time and place for a supervised

_____

[11] Docket No. 13.

[12] Docket No. 14.

[13] Docket No. 15.

[14] Docket Nos. 18, 19, respectively.

[15]  Docket No. 21.

[16]  Ultimately, the court did not find that the appointment of a GAL would be helpful to the court's resolution of this matter and has therefore never ordered that a GAL be appointed.

[17] At the hearing, Petitioner's counsel indicated that because Respondent's Response Brief and exhibits had been filed late on June 27, 2013, he had not had time to thoroughly review everything or to respond to Ms. Libbey-Aguilera's arguments.   He asked for an opportunity to file a reply to her response, and the court set a deadline of July 12, 2013 for the Reply Brief, which deadline was later extended, with permission of the court, to July 19, 2013.

[18]  Petitioner had sought to see his children at the initial June 12 hearing, but the court declined to order a visitation at that time.

visit within the next few days, while Mr. Matas-Vidal was still in the United States. Subsequently, because of the children's reluctance about seeing their father, the parties decided that the children should meet with a reunification therapist prior to their first meeting.[19]   As of the date of this Order, it appears that the children have met at least twice with a therapist but have not yet visited with their father.[20]   At the June 28 hearing, the court also conducted an *in camera* interview of each of the minor children, without any attorneys present.

### III.  FINDINGS OF FACT

Petitioner and Respondent were married in Mexico City on June 26, 1999.  Petitioner is a Mexican national, and Respondent has dual citizenship in Mexico and the United States, as her father was a United States citizen and her mother was a Mexican citizen.  SM-L was born in Mexico City in May 2001, and RM-L was born in Mexico City in November  2003.  At some point when the children were very young, the couple discussed the possibility of moving to the United States, but that possibility never came to fruition because Petitioner could not find adequate-paying work in the United States.  The children were granted United States citizenship in 2005.  In October 2006, Ms. Libbey-Aguilera purchased a condominium in San Antonio, Texas and sometimes visited there.  For the duration of their marriage, however, Petitioner, Respondent, and their two children always lived in Mexico City.  They lived there  until the time Ms. Libbey-Aguilera removed the children from Mexico to Utah in December 2010.

---

[19]   The parties had reached this agreement while the court was still conducting its in camera interviews of the children.  After the interviews, the court praised this agreement by the parties and confirmed to counsel that the children were scared to see their father.  *See* Transcript, Docket No. 25 pp. 44-46.

[20]   *See* Sealed Docket No. 35, Letter from Paul W. Dawson, MSW, LCSW.

There appears to have been significant discord in the marriage for many years. When Petitioner expressed his desire for a divorce in September 2007, Respondent took a trip to Texas, taking the two children with her without seeking permission from their father. The circumstances of her return several days later are disputed but immaterial to the resolution of this matter. In any event, after her return to Mexico, Petitioner filed for divorce in early October 2007 in Mexico City.

On October 16, 2007, the Mexican court issued an Order barring the removal of the children from Mexico. Petitioner had sought such an Order because of the previous incident when Respondent had taken the children to Texas without his permission. On December 14, 2007, after a mediation on December 11, 2007, the court ordered that Ms. Libbey-Aguilera would be granted the provisional physical custody of the children at their marital domicile. Petitioner would have visits on Saturdays and Sundays every other week from 10:00 a.m. - 1:00 p.m. at the Supervised Visitation and Socialization Center. It was also ordered that Mr. Matas-Vidal may socialize with his children on holidays, the children's birthdays, and fifty percent of school vacations, with prior notice and mutual agreement of both parties.[21] The December 14, 2007 Order again prohibited Respondent from taking the children out of Mexico.[22]

On June 30, 2010, the Mexican court issued an order granting "*custodia definitiva*" to

---

[21] These visits would not have been at the Socialization Center, and it does not appear that Respondent ever permitted these visits.

[22] *See* Docket No. 22-1, Respondent's Affidavit in Support to Objections to Petition for Immediate Return, p. 4; *see also* Docket No. 28-3, Ex. 5(b) Temporary Custody & Support Order, English Translation.

Respondent (the "June 30, 2010 Order").[23]  Respondent argues that the Order granted her "sole

custody" and dissolved any restrictions on her travel outside of Mexico.  Petitioner, however, has

provided evidence that the English translation of "custodia definitiva" is not "sole custody," as

that term is understood in the United States, and he has also provided evidence that, because he

still had custody rights, Respondent was still prohibited from leaving Mexico.[24]  The June 30,

2010 Order provided that Mr. Matas-Vidal "has the obligation and essential human right to visit

and go out with his children . . . on Saturdays and Sundays . . . every other weekend.  Visitations

shall begin on Saturdays at 10 AM and end on Sundays at 6 PM." [25]  These visits were not

ordered to take place at the Supervised Visitation and Socialization Center.  Mr. Matas-Vidal was

to "pick the children up at they place where they live with their mother and return them to the

same place."[26]

In August 2010, each parent appealed the June 30, 2010 Order.  Mr. Matas-Vidal

appealed the Order because, among other things, he believed that Ms. Libbey-Aguilera was

obstructing his ability to visit with the children and he thought further psychological testing

would assist the court in its determination.[27]  During 2010, new psychological examinations were

---

[23]  Docket No. 28,  Ex. 14(b).   The Order was published on July 12, 2010.  Respondent initially claimed that the Order was entered on July 12, 2009, but there is no dispute now that the Order was published on July 12, **2010**, following proceedings on June 30, 2010.

[24]  Docket No. 31, Ex. 2.

[25]  Docket No. 28,  Ex. 14(b) at p. 14 (English Translation).

[26]  *Id*.

[27]  It is unclear why Ms. Libbey-Aguilera appealed, but she has not disputed that she appealed the June 30, 2010 Order.

in progress but were not filed with the court until February 2011–after Respondent had fled Mexico.

On November 25, 2010, a bifurcated decree of divorce was entered. Thus, the divorce had become final, but the issue of child custody and support were still being litigated. During the custody litigation, Petitioner exercised all visitation awarded to him by the Mexican court. He regularly exercised his right of access until the children were removed from Mexico. On January 8, 2011 and January 9, 2011, he went to the Supervised Family Interaction Center but Ms. Libbey-Aguilera and the boys did not show up. He then confirmed that they no longer lived at their marital home and was informed by the boys' school that, as of December 16, 2010, the boys had stopped attending school.

In December 2010, Respondent surreptitiously removed the children from Mexico to the United States.[28] She came directly to Orem, Utah and enrolled the children in school on December 21, 2010. They have been continuously enrolled in the same school since January 2011. Teachers and administrators have repeatedly noted their good behavior and academic excellence.[29] The children are both on a competitive swim team. SM-L was a cub scout and now participates regularly as a boy scout. He also is on a soccer team. RM-L is a cub scout. They were both baptized as members of the Church of Jesus Christ of Latter-day Saints and attend meetings regularly. SM-L received the Aaronic Priesthood when he turned twelve. They both spend substantial time with their maternal grandmother. Respondent began working for the

---

[28] Respondent claims that she acted on the belief that the final custody order no longer restricted her from lawfully taking the children across the border to the United States. Docket No. 22-1, Respondent's Aff. at p.6.

[29] *See* Docket No. 22-1, Respondent's Aff. at pp.7-8 and attached exhibits.

Provo School District on March 7, 2011 and has remained gainfully employed with the district since that time.

On January 7, 2011, after Respondent had removed the children from Mexico, the Mexican appeals court revoked the June 30, 2010 Order. On February 4, 2011, the second set of psychological reports were issued.[30] While the English translations of these reports are somewhat difficult to analyze, it is clear that the psychological report on the children found that they did not have emotional indications that were consistent with a profile of a child that had suffered violence.[31] In addition, while the boys both had a negative view of their father, the psychologist noted their perception was "without sustaining real or valid experiences" and that their attitudes "are determined by induction and manipulation which their mother has exercised upon them."[32]

The psychological report on Ms. Libbey-Aguilera found, among other things, that she had a "tendency to lie," dysfunctional behavior patterns which may affect in a negative manner the interaction within her family and social environment," that she "tends to carry out manipulation attitudes in particular with her children," and that she had "aggressive or violent tendencies, especially of a verbal nature.[33] The report also noted that Ms. Libbey-Aguilera now reported

---

[30] The findings in these second psychological reports do not vary significantly from the initial reports, prepared in 2008. *See* Docket No. 28, Ex. 11(b).

[31] *See* Docket No. 4-1, Ex. 21-b, p. 7.

[32] Docket No. 4-1, Ex. 21-b, pp.4-5. The psychologist noted that the dread the boys feel about their father is "more consistent with induction and manipulation attitudes to them than as a result of their own experiences," *id*. p. 7, and that it "is inferred that they have been mostly induced or manipulated by their mother." *Id*.

[33] Docket No. 4, Ex. 20-b, pp. 210-212.

taking the children to a private psychological evaluation to confirm the use of violence and

sexual abuse, which was information Ms. Libbey-Aguilera "did not express in her first

evaluation."[34]   The psychological report on Mr. Matas-Vidal stated that there were no indications

of aggressive or violent tendencies.[35]   The psychologist found no reason why he should not live

together with his children.[36]   Petitioner suggests that Respondent fled before the reports were

issued because she suspected that they would not be favorable to her.

On February 9, 2011, in the District Court for the Seventh Judicial District in the State of

Idaho, Respondent had her name legally changed to Brooke Robinson, claiming that she needed

to change her name because she was "divorcing her husband and am seeking to avoid being

located by my husband for the reason he has threatened to kill me and my family."[37]   Respondent

and her two children had been living in Orem, Utah from December 2010 through the present

time.

Petitioner had been looking for his children since he realized they were gone in January

2011.  He had started to try to find Respondent in Texas, believing she was there because she had

previously purchased a condominium there.  Because she had changed her name to Brooke

Robinson in early 2011, and because she had changed the boys' names in their school records in

---

[34]  *Id*. p. 207.

[35]  Docket No. 4, p. 183, 191.

[36]  *Id*. at p. 183.

[37]  Docket No. 30-7, Exhibit 7.  As required by Idaho law, respondent represented in her
name-change petition that she was a resident of Idaho, but Respondent admits now that she was
never a resident of Idaho.

October 2011,[38] it took Petitioner until earlier this year to discover where his children were located. Law enforcement located Respondent in Utah in May 2013. The instant Petition was filed on June 7, 2013.[39]

## IV. CONCLUSIONS OF LAW

### A. APPLICABILITY OF THE HAGUE CONVENTION

The court finds that the Convention applies to this dispute. SM-L and RM-L are both under 16 years old; they were habitual residents of Mexico; and both Mexico and the United States are contracting states.[40] *See* 42 U.S.C. § 11603(e)(1)(A); Hague Conv., art. 3.

### B. WHETHER THE REMOVAL WAS WRONGFUL

The first question the court must address is whether the children were "wrongfully removed" from Mexico, or, in other words, whether they were removed in violation of a right of custody. Once a petitioner establishes that removal was wrongful, the child must be returned unless an exception is applicable. *Abbott v. Abbott* 130 S. Ct. 1983, 1990 (2010) (citing 42 U.S.C. § § 11603(a)); *Blondin v. Dubois*, 189 F.3d 240, 245 (2nd Cir. 1999); *see also* 42 U.S.C. § 11601(a)(4) ("Children who are wrongfully removed or retained within the meaning of the Convention are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies."). Moreover, "[e]ven where the grounds for one of these "narrow" exceptions have been established, the district court is not necessarily bound to allow the child to

---

[38] *See* Docket No. 28, Ex. 23.

[39] Docket No. 1.

[40] The court finds unmeritorious Respondent's argument that the children's habitual residence had shifted to the United States at the time of removal.

14

remain with the abducting parent." *Blondin*, 189 F.3d at 246 n.4 (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1067) (6th Cir. 1996) ("[A] federal district court retains, and should use when appropriate, the discretion to return a child, despite the existence of a defense, if return would further the aims of the Convention.")).

Petitioner bears the burden of showing by a preponderance of the evidence that the removal or retention was wrongful. Accordingly, Petitioner must demonstrate that:

(A)     the child was habitually resident in a given state at the time of the removal or retention;

(B)     the removal or retention was in breach of petitioner's custody rights under the laws of that state; and

©)     petitioner was exercising those rights at the time of removal or retention.

*Chafin v. Chafin*, 133 S. Ct 1017, 1021 (2013) (*quoting* Hague Conv., art. 3).

Here, the court finds that Petitioner has met his burden of showing by a preponderance of the evidence that SM-L and RM-L were habitually resident in Mexico City at the time of the removal. The children were born in Mexico City and never lived anywhere other than Mexico until Respondent removed them to the United States in December 2010.

The court also concludes that the removal was in breach of Petitioner's custody rights under Mexican law and that Petitioner was exercising those rights at the time of removal. Although Respondent claims that she was awarded "sole custody" and that any restraints on her ability to take the children across the border were dissolved, the court does not agree. The July 9, 2010 Order states that Respondent was given "*custodia*

*definitiva*," but that is not the same thing as "sole custody," as discussed below.[41] It is unclear

why Respondent believed that the Order gave her the right to leave Mexico with the children

when the June 30, 2010 Order provided that Mr. Matas-Vidal could visit and socialize with his

children on Saturdays and Sundays every two weeks from Saturday at 10:00 a.m. until Sunday at

6.00 p.m.[42]

Moreover, both parties appealed that order in August 2010. Under Mexican law, the

challenged order had no effect, so the *ne exeat* order from October 16, 2007 remained in effect.[43]

In addition, even the bifurcated divorce decree, issued on November 25, 2010, provides

that: "both parties stated that no settlement may be reached, since the legal status of their

minor children whose names are [SM-L and RM-L **are subject to litigation** with the

36th Mexico City Family Court."[44] Because the June 30, 2010 order was being appealed,

and because custody was still subject to litigation, the interim *ne exeat* order from

October 16, 2007 continued to apply.[45]

---

[41] The July 9, 2010 Order was ultimately revoked on January 10, 2011. *See* Docket No. 30, Ex. 5 (the Order is mistakenly identified as being published on January 10, 2010, but there is no dispute that it was published on January 10, 2011). Because Respondent had already left the country, the court cannot rely on the revocation of that Order in considering the status of custody rights as of the date of the wrongful removal.

[42] Docket No. 28, Ex. 14(b).

[43] *See* Petitioner's Reply Memorandum, Docket No. 31, Ex. 2, which is a Declaration by Petitioner's Mexican attorney clarifying these points of Mexican law.

[44] Respondent's Opp'n, Exhibit 17(b) to Document No. 22, near end of first paragraph (emphasis added).

[45] The Mexican court reiterated in September 2011 that the *ne exeat* Order still applied. *See* Docket No. 4-1, Ex. 23(b). The court has not considered this fact in determining whether the

Regardless of which Order applied, however, Petitioner had intrinsic *ne exeat* rights barring the children's removal. If a petitioner only has "rights of access" rather than "rights of custody," then the petitioner cannot seek return of the child under the Convention. *See, e.g., Abbott*, 130 S. Ct. at 1989. The issue of "custody" must be addressed under the law of Mexico. *See Pesin v. Osorio Rodriguez*, 77 F. Supp. 2d 1277, 1284 (S.D. Fla. 1999); *Ohlander v. Larson*, 114 F.3d 1531, 1541 (10th Cir. 1997). Pursuant to Mexico's Civil Code, both parents generally have "rights of custody" to their children at all times. *See, e.g., Asuncion Mota v. Rivera Castillo*, 692 F.3d 108 (2nd Cir. 2012); *Whallon v. Lynn*, 230 F.3d 450 (1st Cir. 2000); *Saldivar v. Rodela*, 879 F. Supp. 2d 610 (W.D. Tex. 2012). In these cases, the U.S. court accepted affidavits from Mexican lawyers describing rights of custody in Mexico.

In this case, Petitioner has provided a declaration by Petitioner's Mexican counsel, in which he provides an explanation of *patria potestas*, which means "parental authority" in Spanish, and is somewhat akin to the American notion of "legal custody," or decision-making authority for a minor child. In Spanish, "custodia" refers to what we in the United States would call "physical custody," which addresses which parent a child lives with. While a Mexican court may grant custody to one parent, that does not negate

---

removal was wrongful because Respondent had already fled Mexico by that time. The Order, however, lends credence to the legal explanations of Petitioner's attorney in Mexico, as noted below.

the other parent's rights of parental authority.[46]

In *Abbot v. Abbott*, 130 S. Ct. 1983 (2010), the United States Supreme Court concluded that a *ne exeat* right is a right of custody under the Convention. *See id*. at 1990-91. A *ne exeat* right consists of the authority to consent before the other parent may take the child to another country. *See id*. at 1987.

Having considered the various cases cited by the parties, the court concludes that Petitioner's *patria potestas* rights are rights of custody under the Hague Convention. Accordingly, Respondent's removal of the children from Mexico violated Petitioner's rights of custody that arose under the laws of Mexico and therefore, the removal was wrongful.

As noted previously, once a petitioner establishes that removal was wrongful, the child must be returned unless an exception is applicable. *Abbott,* 130 S. Ct. at 1990 (citing 42 U.S.C. § § 11603(a)). Respondent, has asserted several defenses available under the Hague Convention, which will be addressed in turn below

## C. RESPONDENT'S DEFENSES

### I. Article 13 "Grave Harm" Defense

Respondent contends that there is a grave risk that return of the children would expose them to physical and/or psychological harm. Pursuant to Article 13 of the Convention, a court is not bound to order the return of the child if the person who

---

[46] *See* Docket No. 31, Ex. 2.

opposed the return establishes that "there is a grave risk that his return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Art. 13(b). Respondent must establish the grave risk by "clear and convincing" evidence. 42. U.S.C. § 11603(e)(2).

A "grave risk" of harm from repatriation arises in two situations: (1) where returning the child means sending him to a zone of war, famine, or disease; or (2) in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection.

In addition, the potential harm to the child must be severe, and "[t]he level of risk and danger required to trigger this exception has consistently been held to be very high." *Norden–Powers v. Beveridge*, 125 F. Supp. 2d 634, 640 (E.D.N.Y. 2000) (citing cases). The grave risk involves not only the magnitude of the potential harm but also the probability that the harm will materialize. *Van de Sande v. Van de Sande*, 431 F.3d 567, 570 (7th Cir. 2005).

In this case, Respondent has not established by clear and convincing evidence that there is a grave risk that the return of the children would expose them to physical or psychological harm or otherwise place them in an intolerable situation. The children would not be returned to a zone of war, famine, or disease.

In addition, while Respondent has alleged that she and the children were victims of

domestic violence, the court is not persuaded that these allegations are entirely true.[47] For example, Respondent did not raise any such concerns during her divorce proceedings. In fact, in her Answer to the Complaint for Divorce, she states "there was an exchange of insults, where today the plaintiff [Mr. Matas-Vidal] always acted in a mocking way and *although he had never physically assaulted me*, he did it with his attitudes."[48] This Answer is dated November 22, 2007, well after the parties separated on August 5, 2007. In addition, the psychological reports submitted in this case do not suggest that Petitioner was abusive toward his wife or children or that Respondent reported any abuse at that time. Indeed, the initial psychological report states that "with regard to the children, [Petitioner] was identified with an affective bond toward them, showing interest and concern for them, affective and normative toward them, so there are no problems for coexistence."[49] The final report reached the same conclusion.[50]

Indeed, the supplemental reports suggest that Respondent had manipulated her children to dislike their father. Among other things, the psychologist stated:

> From analysis of obtained information at applied instruments, there were not found significant data to establish that minor children show fear attitudes to any of their parents, becoming important the fact that even

---

[47] Even if some of the allegations are true, they have not been proven by clear and convincing evidence, and, in any event, the court does not find that they rise to a level of risk and danger that would justify applying this exception.

[48] Docket No. 28-2, Ex. 4 ¶ 9 (emphasis added).

[49] Docket No. 28-9, Ex. 11.

[50] Docket No. 4, pp. 183, 191.

though they openly express feeling certain dread to their father, this results more consistent with induction and manipulation attitudes to them than as a result of their own experiences.[51]

Also, while Respondent initially submitted a translation of very negative comments the children allegedly made during a mediation, Petitioner pointed out that the translation was completely inaccurate (and that it was a fraud upon the court).[52] Respondent later filed Corrections, conceding that the translation submitted was not actually a translation of the mediation, but of other reports and hearings and that the inadvertent mistake had been made due to language barriers and time constraints. [53] During the mediation, no allegations of abuse were raised, and when SM-L was questioned, he declared he loved and wanted to visit with his father. His negative comment to the court was that his father lied to the boys by saying he would play with them, then did not.[54] The family pediatrician never noticed any type of evidence that would suggest any type of physical abuse.[55] The parties' marriage counselor has also provided an affidavit stating that she saw no issues of violence between them, and neither party mentioned any violence in the

---

[51] Docket No. 4-1, Ex. 21(b) at p. 7.

[52] Docket Nos. 30, 31.

[53] Docket 33, Corrections to Respondent's Exhibits. The court has no doubt that the incorrect translation was inadvertently submitted.

[54] Docket No. 30, Ex. 1, 2.

[55] Docket No. 30, Ex. 9.

home. [56]

The children's current fear of their father appears to be based primarily (but not exclusively) on one alleged "incident" involving each child.  When SM-L was sixteen-months old, Respondent claims that Petitioner pushed him against a step in the bathroom, from which he sustained a cut above his right eye and was seen by a plastic surgeon.  Petitioner claims that a shaky changing table gave way and SM-L fell to the floor.

When RM-L was 15 months old, Respondent claims that Petitioner pushed him into a chair resulting in eye injuries.  Petitioner denies that this happened.[57]  While the court cannot divine what actually happened in these various alleged incidents, what is clear is that both children discussed these events with the court as though they had clear memories of the occurrences, which the court does not find to be plausible, given their ages at the time.[58]  They also appear to have general recollections of their father choking

---

[56] *Id*.

[57] He also denies another incident alleged by Respondent–that he slammed a piano cover shut, thereby injuring RM-L's face.  In fact, Petitioner claims that they never even had a piano.

[58] Respondent also claims that Petitioner pushed RM-L into a pipe in the yard at the Supervision Center, splitting his lip.  Petitioner denies that this happened, and the Center Report from June 14, 2008 reported that Petitioner was playing with the children in the garden, where they were playing ball and that RM-L accidentally struck his elbow on a tube serving as a garden fence.   There is also a note stating that when Petitioner noticed it, he washed it with soap and water.  *See* Docket No. 30, Ex. 10.  Given that the visits were supervised and that there is a contemporaneous note stating what happened, the court does not give any credence to Respondent's version of this incident.  The court also does not give credence to Respondent's claim that Petitioner's brother arrived at the Visitation Center in October 2009 to attempt to kidnap the children.

or spanking them, along with other instances of violence, but these allegations have not been proven by clear and convincing evidence.

Moreover, the records submitted from the Supervised Visitation Center suggest that, at first, the children did not exhibit any fear or reluctance to see their father. Indeed, they appeared to demonstrate a warm, loving, and playful interaction.[59] Over time, however, they seemed to develop more hesitation about seeing him, which he blames on Ms. Libbey-Aguilera's efforts to alienate the children from him. The reason the children most often gave to the supervisors about their reluctance to visit with their father was that his breath was bad. It seems unlikely that the children would provide such an answer if they were actually subjected to physical or psychological abuse, and it is puzzling that the children did not appear to have any reluctance to see their father during the beginning weeks or months of their supervised visits. Indeed, even the Mexican Court Order from June 30, 2010, upon which Respondent relies to argue that she was awarded sole custody, states that "there is no danger" in "any of the parents exercising custody" and stated that Mr. Matas-Vidal had "the obligation and essential human right to visit and out with his minor children" every other weekend.[60]

It is not the function of this court, however, to determine whether any domestic violence actually occurred. This court must determine, in cases where "serious abuse or

---

[59] *See* Docket 30, Ex. 10.

[60] Docket No. 28-13, Ex. 14(b) at page 38 of 40.

neglect" has been proven by clear and convincing evidence, whether Mexico would be incapable or unwilling to provide protection to the children. The court finds that Respondent has not demonstrated by clear and convincing evidence that there is evidence of "serious abuse or neglect," and that even if there were, she has not demonstrated that Mexican courts would be incapable of providing adequate protection. Thus, the court concludes that Article 13 "grave risk" defense does not apply in this case.

### ii. Article 20 "Public Policy" Defense

Article 20 of the Convention states, "The return of the child under the provisions of Article 12 may be refused if this would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." This is an affirmative defense that Respondent must prove by clear and convincing evidence. 42 U.S.C. § 11603(e)(2)(A). This is often referred to as the "public policy" defense. The defense is to be invoked only on "the rare occasion that return of a child would utterly shock the conscience of the court or offend all notions of due process." *Souratgar v. Fair*, 2013 WL 2631375 at *8 (2nd Cir. June 13, 2013) (quoting U.S. State Dep't, Hague International Child Abduction Convention: Text and Legal Analysis, Pub. Notice 957, 51 Fed. Reg. 10,494, 10,510 (Mar. 26, 1986)). "We note that this defense has yet to be used by a federal court to deny a petition for repatriation." *Id*. (citing Fed. Jud. Ctr., The 1980 Hague Convention on the Civil Aspects of International Child Abduction: A Guide for Judges 85 (2012)). The court finds no merit to this

defense and summarily denies it.

### iii. Article 12 "Well-Settled" Defense

Article 12 provides, in relevant part:

> Where a child has been wrongfully removed . . . and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned *shall* order the return of the child forthwith.  The judicial or administrative authority, even where the proceedings have been commenced after the expiration of the period of one year referred to in the proceeding paragraph, shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment.

Art. 12 (emphasis added).  Accordingly, the default presumption under the Convention is that a child shall be returned to the state from which he originally was wrongfully removed unless both of two conditions are met: (1) one year has elapsed between the date of wrongful removal and the date proceedings commence; and (2) the child is found to be "now settled in its new environment."  *Loranzo v. Alvarez*, 697 F.3d 41, 51 (2nd Cir. 2012).   In other words, if more than one year has elapsed since the date of wrongful removal *and* the child is now settled in his new environment, the court *may* – but need not– refuse to order repatriation.  *See Blondin v. Dubois*, 238 F.3d 153, 164 (2d Cir. 2001).  Put differently, "if more than one year has passed, a 'demonstra[tion] that the child is now settled in its new environment' may be a sufficient ground for refusing to order repatriation." *Id*.  The standard under Article 12 does not call for determining in which location the child is relatively better settled, but rather for determining whether the child has become so settled in a new environment that repatriation would be against the child's best interest.  *Id.*

In determining whether a child is settled within the meaning of Article 12, a court considers a number of factors that bear on whether the child has "significant connections to the new country." 51 Fed. Reg. at 10509. These factors include: (1) the child's age; (2) the stability and duration of the child's residence in the new environment; (3) whether the child attends school or day care consistently; (4) whether the child has friends and relatives in the new area; (5) the child's participation in community or extracurricular school activities, such as team sports, youth groups, or school clubs; and (6) the respondent's employment and financial stability. In some circumstances, we will also consider the immigration status of the child and the respondent. In general, this consideration will be relevant only if there is an immediate, concrete threat of deportation. Although all of these factors, when applicable, may be considered in the "settled" analysis, ordinarily the most important is the length and stability of the child's residence in the new environment. *In Re B. Del C.S.B.*, 559 F.3d 999, 1009 (9th Cir 2009)

In the instant case, SM-L and RM-L have been in Utah since late December, 2010– for over two and one-half years. The court finds that they are both very well settled. And given the boys' ages, 12 and 9 ½, respectively, these thirty-plus months have been meaningful to the boys. They have been consistently enrolled in school since January 2011. They have missed very few days during those two school years, and their academic success has been remarkable.[61] Both boys have many friends, caring neighbors,

---

[61] For example, their school principal has written a glowing review of both boys, stating, among other things, that "they both are among the very best behaved and well-mannered students I have known in school during my 13 years as a teacher and 15 years as a public school administrator. They have excellent attendance, including never being tardy to school the entire past year, and they have never required any attendant or behavior interventions from the school or their teachers." In addition, he stated that both "regularly are recognized and receive awards

and fellow LDS church members with whom they have formed close bonds.  Their

maternal grandmother also frequently cares for them.  The children are active in their

church, in boy scouts (or cub scouts for RM-L), and they are on a competitive swim team.

SM-L is also on a soccer team.  Many friends and neighbors have provided glowing

letters about Respondent and the boys, and attesting to the boys' happiness and stable

environment.[62]  Their mother has also been consistently employed since March 2011 and

appears to be financially stable.[63]  They boys both speak fluent English and appear to have

adjusted well to their living situation.  Given the outpouring of support for the boys and

Respondent, both in terms of having friends and neighbors attend the two court hearings

and in submitting letters to the court, the court has no question that these two boys are

surrounded by a loving and supportive community and that the boys are thriving in their

current environment.   They are indeed settled in their new environment.

### a. Equitable Tolling

Petitioner argues that he is entitled to equitable tolling of the one-year period for the filing

of his Hague petition and that the Article 12 defense is therefore inapplicable.  Article 12 of the

Convention requires the return of a child, whether or not he is "settled," if the non-abducting

---

in our quarterly recognition celebrations for going "above and beyond" in numerous ways, and in
every way they are exemplary students and citizens."  He also notes that "they are thriving and
happy in school, and they are well on their way to being happy, productive, and successful
citizens.  I have absolutely no concerns about them or their well-being."  *See* Docket No. 28, Ex.
21J, Letter from School Principal, dated June 26, 2013,

[62]  *See* Docket No. 28, Ex. 26.

[63]  *Id.*

parent files his Hague petition within one year of the child's wrongful removal or retention. *See* Hague Convention, art. 12.

Some courts have held that equitable principles may be applied to toll the one-year period when circumstances suggest that the abducting parent took steps to conceal the whereabouts of the child from the parent seeking return and such concealment delayed the filing of the petition for return." *See, e.g., Duarte v. Bardales*, 526 F.3d 563, 570 (9th Cir. 2008). Relying on this holding, Petitioner contends that, even if the court finds the boys to be "now settled," the court should nevertheless order their return because Respondent concealed the boys and because Petitioner filed his petition within one year of learning of their location. While the court agrees that Respondent concealed the boys, that such concealment delayed Petitioner's ability to file a petition, and that he filed his petition within one year after he finally learned of their location, the court declines to apply equitable tolling to the one-year mandatory return period.

The United States Circuit Courts of Appeals are divided on the issue of equitable tolling in this situation. The Fifth, Ninth, and Eleventh Circuit Courts of Appeals have found that equitable tolling may apply in certain circumstances, such as when circumstances suggest that the abducting parent took steps to conceal the whereabouts of the children and the concealment caused the petitioning parent's filing delay. *See Dietz v. Dietz*, 2009 WL 3378590 (5th Cir. Oct. 20, 2009); *In re B. Del C.S.B.*, 559 F.3d at 1014; *Duarte,* 526 F.3d at 570 (9th Cir. 2008); *Furnes v. Reeves*, 362 F.3d 702 , 723-24 (11th Cir. 2004). The Second Circuit Court of Appeals, however, has concluded that equitable tolling found that it does not apply. *See Loranzo v. Alvarez,* 697 F.3d 41, 51 (2nd Cir. 2012), *cert. granted in part*, 133 S. Ct. 2851 (June 24, 2013). The Tenth Circuit has not addressed the issue. Because of the split among the Circuits, the

United States Supreme Court recently granted certiorari on the issue, and thus the issue will be decided within the next term.[64]

In the meantime, however, this court agrees with the Second Circuit and other district courts that have found that the purpose of the one-year mandatory return period is not to provide a deadline for a petitioner to assert a claim but rather is to put a limit on the uprooting of a settled child. As one district court explained, "the evident import of [Article 12's one-year period] is not so much to provide a potential plaintiff with a reasonable time to assert any claims, as a statute of limitations does, but rather to put some limit on the uprooting of a settled child." *Toren v. Toren*, 26 F. Supp. 2d 240, 244 (D. Mass.1998), *opinion vacated on other grounds by Toren v. Toren*, 191 F.3d 23 (1st Cir.1999); *see also* Perez-Vera Report ¶ 107.

The district court in *Lozano* found that, unlike a statute of limitations prohibiting a parent from filing a return petition after a year has expired, the "settled" defense merely permits courts to consider the interests of a child who has been in a new environment for more than a year before ordering that child to be returned to her country of habitual residency. *See Lozano*, 809 F. Supp. 2d at 227–28 (reasoning that the one-year period in Article 12 is not analogous to a statute of limitations); *see also Aranda v. Serna,* 911 F. Supp. 2d 601, 613 (M.D. Tenn. 2013) (finding the reasoning of the Fifth, Ninth, and Eleventh Circuits unpersuasive and agreeing with Second Circuit that equitable tolling does not apply to equitably toll the one-year period based on concealment); *Yaman v. Yaman*, 2013 WL 322204 (D. N.H. Jan. 28, 2013) (same); *Matovski v. Matovski*, 2007 WL 2600862, at *12 (S.D.N.Y. Aug. 31, 2007) (concluding that one-year period is not analogous to a statute of limitations); *Anderson v. Acree,* 250 F. Supp. 2d 872, 875 (S.D.

---

[64] *Lozano v. Alvarez*, 133 S. Ct. 2851 (June 24, 2013).

Ohio 2002) (same); *Toren v. Toren*, 26 F. Supp. 2d 240, 244 (D. Mass.1998) (same), *vacated on other grounds*, 191 F.3d 23 (1st Cir.1999).

Even the Ninth Circuit, while still applying equitable tolling, recognized that "[t]he rationale behind Article 12's "now settled" defense is that when a child has become settled and adjusted in his new environment, a forced return might only serve to cause him further distress and accentuate the harm caused by the wrongful relocation." *In re B. De. C.S.B.*, 559 F.3d 999, 100 (9th Cir. 2009) (quoting Beaumont & McEleavy, The Hague Convention on International Child Abduction 203 (1999)).

The Second Circuit, in a well-researched and well-reasoned opinion, rejected the petitioner's argument on appeal that the district court should have equitably tolled the one-year filing period until the date he reasonably could determine that his daughter had been removed from the United Kingdom and taken to the United States. *Lozano,* 697 F.3d at 50-51. The Second Circuit recognized that:

> While the text of the Convention does not explicitly address the issue, we note that the text does provide one clue that tolling was not anticipated. The language of Article 12 expressly starts the running of the one-year period "from the date of the wrongful removal or retention." It would have been a simple matter, if the state parties to the Convention wished to take account of the possibility that an abducting parent might make it difficult for the petitioning parent to discover the child's whereabouts, to run the period "from the date that the petitioning parent learned [or, could reasonably have learned] of the child's whereabouts." But the drafters did not adopt such language. . . . [T]he drafting history demonstrates that this was a conscious choice, and that the drafters specifically rejected a proposal to have a different date trigger the start of the one-year period when the child's whereabouts had been concealed.

*Lozano v. Alvarez*, 697 F.3d 41, 51 n. 8 (2nd Cir. 2012) (internal citations omitted). The *Lozano* court also found that this interpretation of Article 12 "is further bolstered by Article 18, which provides that none of the provisions in the Convention "limit the power of a judicial or

administrative authority to order the return of the child at any time." *Lozano,* 697 F.3d at 52 n.10

(citing Convention, art. 18).  Moreover, the Lozano court also relied on the Pérez–Vera Report[65]

and concluded that:

> Simply put, the Convention is not intended to promote the return of a child to his
> or her country of habitual residency irrespective of that child's best interests;
> rather, the Convention embodies the judgment that in most instances, a child's
> welfare is best served by a prompt return to that country.  The signatory states,
> however, were aware that there are situations where "the removal of the child can
> ... be justified by objective reasons which have to do either with [the child's]
> person, or with the environment with which [the child] is most closely
> connected." Pérez–Vera Report at 432 ¶ 25.  Accordingly, the Convention
> "recognizes the need for certain exceptions" to the signatory states' "general
> obligation[ ] . . . to secure the prompt return of children who have been unlawfully
> removed or retained." *Id.* Pérez–Vera describes these "exceptions" as "concrete
> illustrations of the overly vague principle whereby the interests of the child are
> stated to be the guiding criterion in this area."

*Id.* at 53-54; *see also Blondin v. DuBois,* 238 F.3d 153, 164 (2nd Cir. 2001) ("*Blondin II*")

(noting that the Convention's drafters recognized that, despite the general aim of "ensur[ing] the

return of abducted children," there "could come a point at which a child would become so settled

in a new environment that repatriation might not be in its best interest.").

In sum, the Second Circuit determined that the Convention's drafting history "strongly

supports the position that the one-year period in Article 12 was designed to allow courts to take

into account a child's interest in remaining in the country to which he has been abducted after a

---

[65]    As noted by the Second Circuit, Elisa Pérez–Vera was "the official Hague Conference
reporter for the Convention." *Lozano*, 697 F.3d  at 52 n.11 (quoting Hague International Child
Abduction Convention;  Text and Legal Analysis, 51 Fed. Reg. at 10,503). "Her explanatory
report [was] recognized by the Conference as the official history and commentary on the
Convention," *id.*, and we have previously held that "it is an authoritative source for interpreting
the Convention's provisions," *id.* (citing *Croll v. Croll,* 229 F.3d 133, 137 n. 3 (2d Cir.2000))
(citation omitted), *abrogated on other grounds by Abbott*, 130 S. Ct. 1983; *see also Gitter,* 396
F.3d at 129 & n. 4.

certain amount of time has passed." 697 F.3d at 54. The court concluded that, [i]f this understanding of the second paragraph of Article 12 is correct, allowing equitable tolling of the one-year period would undermine its purpose. A child may develop an interest in remaining in a country in which she has lived for a substantial amount of time regardless of her parents' efforts to conceal or locate her." *See Lozano*, 697 F.3d at 54. This court agrees.

While the court acknowledges that it may seem unfair and inequitable to Petitioner that the Respondent has essentially been "rewarded" for successfully hiding her children, the alternative determination–to uproot these two boys after they have become so well settled in their new environment in which they have spent the past two and one-half years–seems even more reprehensible and contrary to the ultimate purpose of the Hague Convention. Thus, the court declines to apply the doctrine of equitable tolling to the Article 12 "well-settled" defense.

### iv. The Article 13 "Age and Maturity" Exception

The Hague Convention provides that "[t]he judicial or administrative authority [considering a petition] may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Hague Convention, art. 13. The age and maturity exception is to be narrowly construed and must be shown by a preponderance of the evidence. *England v. England*, 234 F.3d 268, 272 (5th Cir.2000) (citing §§ 11601(a)(4), 11603(e)(2)(A)).

In applying the "age and maturity" exception, a court must not focus solely on the general

goal of the Convention–to protect children from the harmful effects of wrongful removal–but must also carefully determine that the particular child "'has obtained an age and degree of maturity at which it is appropriate to take account of its views.'" *Blondin v. Dubois*, 189 F.3d 240, 247 (2d Cir.1999) (*quoting* Convention, art. 13). The Convention contains no age limit for applying the exception. *Blondin II*, 238 F.3d at 167; *Raijmakers-Eghaghe v. Haro*, 131 F. Supp. 2d 953, 957 (E. D. Mich.2001).

In this case, SM-L is twelve-years old and will start seventh grade next month. RM-L will be ten-years old in three months and will soon start fourth grade. The court had the opportunity to observe the demeanor and maturity of both children during the court's *in camera* interview of each of them. Undoubtedly the task of meeting alone with a federal judge and his staff, with no parents or attorneys present, was a daunting one, but both boys faced the situation courageously. They both demonstrated a high level of maturity in answering the court's questions–answering the questions in an articulate, thoughtful, and respectful manner. They are both good students with strong academic records. They both expressed a strong desire to remain in Utah and had particular objections to returning to Mexico. They confirmed that they enjoy going to school here, they are involved in church and several sports activities, and they have many friends here. Indeed, both boys became visibly distraught when the court discussed the court's task of evaluating whether they should be returned to Mexico. The response of both boys appeared to be purely genuine–not concocted or rehearsed in any way. Additionally, the boys were adamant about not wanting to have a supervised visit their father while he was in town for the instant court proceeding.

Accordingly, the court finds, by a preponderance of the evidence, that the boys are of an appropriate age and maturity such that it is appropriate for the court to take into account their desire to not return to Mexico.

If a court determines, however, that the youngster's opinion is the product of undue influence, the child's wishes are not taken into account. *Desilva*, 481 F.3d at 1286. Here, the court recognizes that the boys have spent the past two years solely with their mother and maternal grandmother, and that this circumstance has undoubtedly had an impact on their desire to stay with their mother in Utah. It is also possible that their mother has negatively colored the boys' view of their father. Here, while the children's objections to returning to Mexico could be due to the mother's possible undue influence over them, the court finds that this possible undue influence is not the only reason the children desire not to return to Mexico, and thus, the court declines to ignore their wishes. The children appear to be genuinely happy and thriving in their current situation. The court has attempted to balance this possible undue influence against other reasons the boys desire to stay here and concludes that even though the mother has perhaps exerted some undue influence on the boys, the court should still take into account the children's wishes to remain in Utah and not be returned to Mexico. For this independent reason, the court declines to return them to Mexico.

The court's decision in this case is not based in any way on a belief that the courts of Utah will do a better job than the courts of Mexico City in addressing this unfortunate custody situation. To the contrary, the court is certain that the courts of Mexico City would be fully capable of handling this litigation. In addition, the court has no doubt that Petitioner genuinely wants to see his children and have a relationship with them, and the court hopes such a

relationship can develop in the future. The court, however, is convinced that the return of these children to Mexico City at this time and under these circumstances–however wrongfully the circumstances have arisen–would severely traumatize these children. The court emphasizes that this decision has a limited purpose and effect. It does not mean that Petitioner cannot exercise his visitation rights with his children. It merely establishes that the boys will not be returned to Mexico but will remain in Utah for any custody proceedings that are initiated here. In light of the pending Extradition proceedings against Respondent, however, the future remains uncertain for this family.

## V. CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that the Petition for Immediate Return of Children to Petitioner Pursuant to the Hague Convention and the International Child Abduction Remedies Act is DENIED. The Clerk of the Court is directed to enter judgment in favor of Respondent.

DATED this 5th day of August, 2013.

BY THE COURT:

DALE A. KIMBALL
United States District Judge